IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY K. SHAHANI,<br><br>        Appellant,<br><br>   v.<br><br>UNITED COMMERCIAL BANK,<br><br>        Appellee.<br>_____/ | No. C 11-00416 CRB<br><br>**ORDER AFFIRMING JUDGMENT** |

Appellant Ray K. Shahani ("Mr. Shahani") entered into a Construction Loan Agreement ("CLA") with United Commercial Bank ("the Bank"). After the Bank foreclosed on his mortgaged property, Mr. Shahani sued for wrongful foreclosure and breach of the CLA. The suit was removed to Bankruptcy Court after Mr. Shahani filed a chapter 11 petition. After holding a trial, the Bankruptcy Court entered judgment for the Bank, and Mr. Shahani appeals to this Court. This Court affirms.

**I.    FACTUAL BACKGROUND**

In September 2006, Mr. Shahani, through the 888 Trust, purchased real property located at 888 Airport Blvd. in Burlingame, California, with the intent to develop it into a large office building. See Appellant's Trial Brief ("App. Tr. Br.") (R. 30) at 3. On March 16, 2007, the Bank and the 888 Trust entered into a CLA to fund the building's development. CLA (R. 31, Ex. B). Mr. Shahani also executed a promissory note, secured by a deed of trust, which was set to mature on April 5, 2008 and allowed for one six-month extension. (R.

31, Ex. C) at C1-C2; (R. 31, Ex. D) at D1-D2.  The Bank did grant the extension, making the final maturity date of the note October 5, 2008.  Appellee's Brief ("Bank Br.") (dkt. 9) at 7.

After executing the loan documents, Mr. Shahani worked on constructing the office building with his general contractor, Scott General, Inc. ("Scott General") until late May 2008, when Scott General abandoned the job site.  Bank Br. (dkt. 9) at 7.  Claiming it was still owed money for work it had performed, Scott General submitted a draw request to the Bank for $196,117.13 ("Draw Request 10").  (R. 31, Ex. I) at I2.  As it typically did before making requested disbursements, the Bank sent Cardinal Consulting Inspection ("Cardinal") to the site on May 29 to verify the basis for Scott General's draw request.  Bank Br. (dkt. 9) at 8.  Based on its inspection, Cardinal prepared and sent a report to the Bank the following day (i) stating that the construction was only thirteen percent completed, (ii) approving only $118,633 of the $196,117 requested by Scott General, and (iii) recommending that the Bank "not fund any draw [requests] until a plan is put into place for finishing the project and that sufficient funds are available to complete."  (R. 31, Ex. J) at J3-J4.

Reacting to General Scott's abandonment of the project and Cardinal's inspection report, the Bank sent Mr. Shahani an email on June 3 declaring him in default and requesting that he provide the Bank with a letter outlining his strategy for finishing the project.  (R. 31, Ex. K) at K1.  The Bank never received a response to that email.  Bank Br. (dkt. 9) at 9.  Two days later, Scott General recorded a mechanic's lien on the property for $196,117.13.  (R. 31, Ex. L) at L2.  Twenty days after that, Scott General recorded a second mechanic's lien on the property for another $235,171.88.  (R. 31, Ex. M) at M2.  In late July, the Bank sent Mr. Shahani two emails explaining that it would not continue making disbursements under the CLA until he had resolved "the issue with Scott General."  See (R. 31, Ex. N) at N1; (R. 31, Ex. O) at O1.  The Bank informed Mr. Shahani that he could resolve the issue one of two ways: (i) he could have the mechanic's liens removed or (ii) he could find a suitable replacement for General Scott and obtain a bond "to wrap around the cost of the remaining construction."  (R. 31, Ex. O) at O1.

2

The record is devoid of communications between July 2008 and December 2008, despite the coming and going of the extended maturity date of October 5, 2008 on the loan. On December 10, 2008, the Bank sent Mr. Shahani an email reminding him that the Bank could not make any disbursements, urging him to complete construction with his own funds, and stating that "[t]he loan is being extended through January 2009." (Ex. 31, Ex. Q) at Q1. Nineteen days later, contradicting its December 10 email, the Bank sent Mr. Shahani a letter notifying him that his loan had "became due and payable on October 5, 2008," and that the Bank would "begin enforceable remedies on or about January 12, 2009." (R. 31, Ex. R) at R1. The letter also stated that Mr. Shahani should call the Bank's corporate counsel with any questions or concerns. Id. Mr. Shahani never responded to the letter, and the Bank proceeded to file a Notice of Default on January 30, 2009. See Bank Br. (dkt. 9) at 25; (R. 31, Ex. S) at S1. After waiting for the statutory three-month period to pass, on May 11, 2009 the Bank filed a Notice of Sale. (R. 31, Ex. T) at T1.

The Bank eventually sold the property on October 1, 2009. Before that date, however, Mr. Shahani had tried to prevent the sale by (i) using his own funds to continue construction, (ii) reaching a settlement with Scott General for $171,185.34, which he claims "would have removed the mechanic's liens," and (iii) attempting to obtain substitute financing. See App. Br. (dkt. 6) at 7; App. Post-Trial Br. (R. 35) at 2. On the last day of September, Mr. Shahani asked the Bank to postpone the sale scheduled for October 1 on the basis that he expected to obtain substitute financing within the next few weeks. See Appellant's Tr. Br. Exhibit List (R. 31, Ex. 7). That evening the Bank responded that some of its staff had "been working all day on this account and this new problem/request" but that they could make "no guarantee that [they would] be authorized to postpone the TS set for [the next day]." See id. The Bank then stated that it would "confirm tomorrow." Id.

The following day, the Bank proceeded to sell the property. See App. Br. (dkt. 6) at 21. Having received no communication from the Bank by the morning of October 1, Mr. Shahani attempted "an eleventh hour chapter 11 petition" to stop the foreclosure. Id. Because Mr. Shahani, representing himself, attempted to make the petition in the name of his

3

trust, however, the bankruptcy court clerk rejected the petition as being filed by an organization not qualifying for chapter 11 relief. See id.

Mr. Shahani then sued the Bank on October 2, 2009 in San Mateo Superior Court for wrongful foreclosure and breach of the CLA. App. Tr. Br. (R. 30) at 3. The suit was removed to the Bankruptcy Court after Mr. Shahani succeeded in filing a chapter 11 petition on February 24, 2010, this time with the help of counsel. See App. Br. (dkt. 6) at 7. The Bankruptcy Court held a trial, and entered judgment for the Bank on January 10, 2011. See Judgment (dkt. 1-1) at 1. Mr. Shahani has appealed to this Court. See App. Br. (dkt. 6). His claims are: (1) the Bank's breaches of the CLA excused Mr. Shahani from further performance under the contract; (2) the Bank breached the covenant of good faith and fair dealing; (3) the Bank's foreclosure was wrongful because it was based on a defective Notice of Default; and (4) the Bank should be estopped from asserting its foreclosure was valid. See App. Br. (dkt. 6) at 2.

## II. JURISDICTION

This Court has jurisdiction of this bankruptcy appeal pursuant to 28 U.S.C. § 158(a). The Bankruptcy Court issued its Memorandum Decision Following Trial on December 27, 2010 and its final Judgment for the Bank on January 10, 2011. See In re Shahani, BKR. 09-33549 DM, 2010 WL 5394799 (Bankr. N.D. Cal. Dec. 27, 2010) ("Bankr. Op. (R. 37)"); Judgment (dkt. 1-1). The Bankruptcy Court's decision forms the basis of the present appeal.

## III. LEGAL STANDARD

A district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. In re Int'l Fibercom, Inc., 503 F.3d 933, 940 (9th Cir. 2007). Contract interpretation is often a mixed question of law and fact. See In re U.S. Fin. Sec. Litig., 729 F.2d 628, 631-32 (9th Cir. 1984). A reviewing court interprets contract language de novo. Id. at 632. But "[w]hen the inquiry extends beyond the words of the contract and focuses on related facts, . . . the trial court's consideration of extrinsic evidence is entitled to great deference and its interpretation of the contract will not be reversed unless it is clearly erroneous." Id.

4

## IV. DISCUSSION

This Court affirms the judgment of the Bankruptcy Court as to all four of Mr. Shahani's claims for the reasons discussed below.

### A. Breach of Contract

As the Bankruptcy Court noted, "pivotal to the resolution here" is determining which party first breached the contract. Bankr. Op. (R. 37) at 2. In chronological order, the actions alleged to have constituted the *first* breach of the contract are as follows: (1) the Bank's failure to disburse funds by May 30, 2008 (five days after Scott General submitted Draw Request 10); (2) the Bank's sending of an email to Mr. Shahani on June 3, 2008 declaring him in default; and (3) Scott General's filing of a mechanic's lien on the property on June 5, 2008. For the reasons discussed in the three sub-sections that follow, this Court finds that the first two actions did not amount to breaches of the contract, and that the third action did amount to a breach. Therefore, this Court agrees with the Bankruptcy Court that Mr. Shahani was the first to breach the contract. See id. This Court further agrees that Mr. Shahani's default on June 5 excused the Bank from making disbursements under the CLA, id. at 6, and that his contract claim therefore fails.

#### 1. The Bank did not breach by failing to disburse funds by May 30, 2008.

Mr. Shahani contends that the Bank breached the CLA on May 30, 2008 when it failed to disburse Draw Request 10. App. Br. (dkt. 6) at 13; Reply (dkt. 24) at 3-7. The disputed provisions of the CLA are two paragraphs of the Disbursement Schedule, which, pursuant to section 35.1.3 of the CLA,[1] sets forth the conditions that must be met before the Bank will make disbursements. Paragraph two states:

> With each Draw Request, Borrower shall submit to Lender such items of information and documentation, including invoices, canceled checks, lien waivers and other evidence as may be required by Lender to show that Borrower is in compliance with the Loan Documents. All such items must be acceptable in form and substance to Lender in the exercise of its reasonable judgment. Lender shall approve or disapprove the Draw Request

---

[1] "Lender shall disburse the Loan as described below and in the Disbursement Schedule." CLA (R. 31, Ex. B) at B35.

5

> within *five business days* of receipt of a completed Draw Request and all other documentation requested by Lender.

CLA (R. 31, Ex. B) Ex. F at B66-B67 (emphasis added).  Paragraph one states: "Borrower acknowledges that delays in disbursements may result from the time necessary for Lender to verify satisfactory fulfillment of any and all conditions to a given disbursement.  Borrower consents to all such delays."  Id. at B65.

According to Mr. Shahani, because he submitted Draw Request 10 and his requisite paperwork on May 23, 2008, the disbursement was due five business days later: on May 30, 2008.  Reply (dkt. 24) at 4.  The Bank, however, takes the position that the five-day clock could not have started running until May 30, 2008, when Cardinal submitted its consultant report to the Bank.  Bank Br. (dkt. 9) at 10.  Thus, the Bank contends, the disbursement was due on June 6, 2008 at the earliest.  Id.  The Bankruptcy Court agreed with the Bank, Bankr. Op. (R. 37) at 5,[2] and so does this Court.

By signing the CLA, Mr. Shahani consented to any delays "necessary for the [Bank] to verify satisfactory fulfillment of any and all conditions."  CLA (R. 31, Ex. B) Ex. F at B65.  As the Bankruptcy Court found, Cardinal Consulting's precise task was "to monitor progress on the project, including verifying percentages of completion in response to draw requests."  Bankr. Op. (R. 37) at 3.  The Bank had requested similar consultant reports from Cardinal for each of the previous nine draw requests for the project.  See Bank Br. (dkt. 9) at 5.  Thus even if paragraph two of the Disbursement Schedule does not contemplate the Bank's request for "other documentation" from a third-party, Mr. Shahani expressly consented to delays that might result from the Bank's other verification procedures under paragraph one.  Accordingly, the Bankruptcy Court did not err when it found that the Bank had until at least June 6 to disburse Draw Request 10, and therefore did not breach the contract by failing to disburse the funds by May 30.

---

[2] The Bankruptcy Court suggested that the Bank may have, in fact, had until June 10 to make the disbursement. Id. However, because this Court finds that Mr. Shahani's June 5, 2008 breach excused the Bank from making further disbursements, such a determination is unnecessary.

6

### 2. The Bank did not anticipatorily breach the contract by declaring Mr. Shahani in default on June 3.

Mr. Shahani claims that on June 3, 2008, the bank anticipatorily breached the CLA when it sent him - and never later retracted - an email stating that "[t]he current situation with Scott General constitutes an Event of Default under which the United Commercial Bank is not obligated to continue disbursing requested draws." (R. 31, Ex. K) at K1. Mr. Shahani argues that because the "situation with Scott General" (i.e., Scott General's abandonment of the job) did not actually constitute an Event of Default under the CLA, the Bank's email was an anticipatory breach that excused Mr. Shahani from further performance. App. Br. (dkt. 6) at 13-14; Reply (dkt. 24) at 1-2; see also Bankr. Op. (R. 37) at 5 (agreeing that Scott General's abandonment of the construction site was not an Event of Default).

The doctrine of "anticipatory repudiation," or "anticipatory breach," has been codified in section 1440 of the California Civil Code:

> If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party.

A party asserting express anticipatory repudiation must demonstrate that (1) the other party absolutely and unequivocally refused to perform and (2) it (the party asserting anticipatory repudiation) effectuated the other party's breach by materially changing its position and treating the repudiation as final. Guerrieri v. Severini, 51 Cal. 2d 12, 19 (1958); Wilton v. Clarke, 27 Cal. App. 2d 1, 4 (1938); see also Taylor v. Johnston, 15 Cal. 3d 130, 137-38 (1975) (denying an anticipatory-repudiation claim because the plaintiff continued efforts to perform and treated the contract as still in force after repudiation by the defendant).

The Bankruptcy Court raised the issue of anticipatory repudiation obliquely, if at all, in its opinion. Because vestiges of an anticipatory-repudiation argument exist in the briefing below,[3] however, this Court will construe the briefs as having raised an

---

[3] Although Mr. Shahani never couched his argument in anticipatory-repudiation language, he did argue that the June 3, 2008 email was erroneous and constituted a breach that "excused the Debtor's further performance." See, e.g., App. Tr. Br. (R. 30) at 9-10.

7

anticipatory-repudiation claim that the Bankruptcy Court rejected when it entered judgment in favor of the Bank. Whether "a party has committed an anticipatory breach by repudiating the contract" is a question of fact. Pac. Coast Eng'g Co. v. Merritt-Chapman & Scott Corp., 411 F.2d 889, 894 (9th Cir. 1969) (citing Gold Mining & Water Co. v. Swinerton, 23 Cal. 2d 19, 28 (1943)). Accordingly, this Court may only overturn the decision below as to the anticipatory-repudiation claim for clear error.

The Bankruptcy Court implied that the June 3 email did not constitute an anticipatory breach of the parties' contract.[4] However, this Court need not address whether it amounted to a breach because, even assuming arguendo that the June 3 email was an absolute and unequivocal repudiation of the contract, Mr. Shahani did not treat and act upon the alleged repudiation as though it were final. Mr. Shahani, like the plaintiff in Taylor, continued to act as though the contract were still in force: following receipt of the email, Mr. Shahani hired a replacement general contractor, continued construction at the site, corresponded with the Bank about possibly obtaining an extension on his loan, and tried to meet the Bank's terms for payments under the CLA. Shahani Decl. (R. 16) 5, 7-8.[5] As a result, Mr. Shahani may not succeed on his anticipatory repudiation claim.

### 3. The first breach of contract occurred on June 5, 2008 when Scott General recorded a mechanic's lien on the property.

The Bankruptcy Court found that the first breach of the CLA occurred on June 5, 2009, when General Scott recorded a mechanic's lien on the property. Bankr. Op. (R. 37) at 5. According to the Bankruptcy Court, the breach was attributable to Mr. Shahani under the CLA, and was "material enough to excuse [the] Bank from funding Draw Request #10." Id. This Court agrees that the recording of a mechanic's lien on the property (i) was an event that would result in default under the CLA and (ii) excused the Bank from making disbursements.

---

[4] The Bankruptcy Court did not expressly address whether the Bank's June 3, 2008 email amounted to a breach of contract. See generally Bankr. Op. (R. 37). However, it found that the only breach existing as of June 5, 2008 was Scott General's recording of a mechanic's lien on the property. Id. at 5. By implication, the Bank's June 3 email was not a breach.

[5] According to Mr. Shahani, the Bank told him that to receive loan disbursement under the CLA, he must hire a substitute contractor, settle with Scott General, and finish construction on the building; Mr. Shahani did his best to comply with these conditions. Id.

8

### i. The recording of the June 5 mechanic's lien was an event that would result in default under the CLA.

The CLA states: "[s]ubject to Borrower's right to contest as provided herein, if the Mortgaged Property becomes subject to any mechanics', materialman's or other liens . . . , and such lien is not removed within thirty (30) days," an Event of Default exists. CLA (R. 31, Ex. B) § 25.20 at B70. Borrower's "right to contest" is described in section 32 of the agreement, which provides that the "Borrower shall not be in default for failure to pay or discharge . . . a mechanic's . . . lien asserted against the Mortgaged property if, and so long as" he meets conditions (a) through (e). CLA (R. 31, Ex. B) § 32 at B33. Nothing in the record indicates that Mr. Shahani met all five of those conditions. For example, condition (c) requires that "Borrower shall have furnished to Lender a cash deposit, or an indemnity bond satisfactory to Lender, in the amount of the . . . mechanics' . . . lien claim, plus [additional fees]." Id. At trial, Mr. Shahani admitted that he did not follow through with his initial effort to "bond around the mechanics' liens" because it was too expensive. T.R. 32:22-33:3. Accordingly, this Court - in line with the Bankruptcy Court - finds that the June 5 mechanic's lien constituted an event that would become a default if not removed.[6] See Bankr. Op. (R. 37) at 5; CLA (R. 31, Ex. B) § 25.20 at B70.

### ii. The recording of the June 5 mechanic's lien excused the Bank from further performance.

The Bankruptcy Court further found that the recording of the June 5 mechanic's lien on the property excused the Bank from making further disbursements under the CLA. See Bankr. Op. (R. 37) at 5. The CLA explains that the Bank could discontinue disbursements if (1) "an event has occurred that with . . . the passage of time could become an Event of Default" and (2) the Bank "in its reasonable judgement determines that" (a) "the event is a default" and (b) the default is "not susceptible of cure." CLA (R. 31, Ex. B) Ex. F § 7(ix) at B70.

---

[6] This Court recognizes that the recording of the first lien did not become a technical Event of Default until thirty days had passed. However, the lack of a technical Event of Default does not change the analysis of Mr. Shahani's breach claim. As discussed in the next sub-section, the CLA expressly allowed the Bank, exercising its reasonable judgment, to discontinue disbursements as soon as the lien was recorded; it did not have to make the disbursement while waiting for the thirty-day period to pass.

9

Scott General's recording of the mechanic's lien on June 5, 2008 satisfies the first condition because it could become an Event of Default with the passage of time (thirty days). CLA (R. 31, Ex. B) § 2.1 at B11; id. § 25.10 at B28. As for the second condition, the facts support a finding that the Bank had reason to believe the recording of the lien was a default that Mr. Shahani would not be able to cure. The Bank reasonably judged the mechanic's lien to be a default: the CLA expressly provides that it would become a default after thirty days. CLA (R. 31, Ex. B) § 25.10 at B28; id. § 25.20 at B70. The only remaining issue therefore is whether it was reasonable for the Bank to determine that the default was not "susceptible of cure." Id. § 25.10 at B28. Mr. Shahani argues that the default could have been cured - or, more accurately, that the Bank did not explain why it could not be cured. Reply (dkt. 24) at 9. The CLA, however, does not require the Bank to prove that the default is not susceptible of cure; it requires only that the Bank be "reasonable in its judgment" that the default would not be susceptible of cure. CLA (R. 31, Ex. B) § 25.10 at B28.

The first lien was for a sum of $196,117.13, (R. 31, Ex. L) at L1, and the second lien was for a sum of $235,171.88, (R. 31, Ex. M) at M1. The Bankruptcy Court determined that "it would require too much speculation for the court to conclude that had [the] Bank paid approximately $118,000 on June 6 . . . that Scott [General] would have removed its first lien and not recorded its second one." Bankr. Op. (R. 37) at 5. Mr. Shahani contests this determination, claiming: "the record establishes that the amount that would have been available to pay Scott General had the Bank made the payment exceeds the $171,185.34 that was in fact required to release the liens." App. Br. (dkt. 6) at 15-16. The "$171,185.34" to which Mr. Shahani refers represents his eventual settlement with Scott General in August 2009. App. Post-Trial Br. (R. 35) at 2. Mr. Shahani totaled his (1) "[a]ccount balance," (2) "[c]ash payments from 6/08-11/08," and (3) "[a]pproved draw request"[7] to a sum of $212,080.99, in an attempt to show that the funds available at the time of Draw Request 10

---

[7] This is the amount of money Cardinal Consulting approved of Request No. 10. App. Br. (dkt. 6) at 15-16.

10

exceeded the $171,185.34 that Scott General, over a year later, accepted in exchange for removing both liens. Id.

The Bankruptcy Court, in determining that the Bank's judgment was "reasonable" under the circumstances, was performing a factual inquiry, and therefore this Court may only reverse its determination if it is clearly erroneous. This Court finds that the Bankruptcy Court did not clearly err when it found that the Bank was reasonable in its judgment. Even if Mr. Shahani's hindsight analysis mathematically shows that the default would have been cured if the Bank had disbursed Draw Request 10 (a matter on which this Court takes no position), at the time the Bank made the "judgment" in question, it was equally probable that disbursing Draw Request 10 would not have led to removal of the first lien and non-recording of the second. Even though Scott General ended up accepting $171,185.34 in satisfaction of its claim, at the time it recorded the first lien, it was claiming $196,117.13. And with both liens combined, Scott General was claiming over $430,000. The Bank had no indication that Scott General would accept significantly less than the amount it sought.

Other circumstances also supported the Bank's judgment that Mr. Shahani would not cure the default. For example, two days before Scott General even recorded the first lien, the Bank asked Mr. Shahani for a letter outlining his strategy for dealing with Scott General's abandonment of the construction site, which Mr. Shahani never provided. See (R. 31, Ex. K) at K1; Bank Br. (dkt. 9) at 5. The lack of response from Mr. Shahani supports the Bank's judgment that he would not be able to settle the dispute. Therefore, the Bankruptcy Court did not clearly err when it found that the Bank reasonably determined that the default was not susceptible of cure.

This Court agrees with the Bankruptcy Court that Scott General's recording of the June 5, 2008 mechanic's lien was a breach by Mr. Shahani, and this breach excused the Bank from further performance under the CLA. Therefore, Mr. Shahani's breach of contract claim fails.

11

### B.     Covenant of Good Faith and Fair Dealing

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Carma Dev. (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 371 (1992). The covenant applies "where one party is invested with a discretionary power affecting the rights of another" and obligates that party to exercise its discretion in good faith. Id. at 371-72. To exercise discretionary power in good faith, a party must act in an objectively reasonable manner. Id. at 373. Yet "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract," and "implied terms should never be read to vary express terms." Id. at 373-74 (citations omitted). Good faith and commercial reasonableness are questions of fact, Gifford v. J & A Holdings, 54 Cal. App. 4th 996, 1006 (1997), and interpretation of contract language is a question of law, Storek & Storek, Inc. v. Citicorp Real Estate, Inc., 100 Cal. App. 4th 44, 55 (2002). Thus this Court may only overturn the Bankruptcy Court's decision that the Bank did not violate its duty of good faith and fair dealing, see Bankr. Op. (R. 37) at 2, if (1) the facts demonstrate that the decision is a clear error or (2) this Court determines de novo that the contract expressly permitted the Bank's actions.

Mr. Shahani claims that the Bank breached the implied covenant of good faith and fair dealing in two ways: (1) when it "us[ed] the mechanic's liens as an excuse to terminate further funding;" and (2) when it "refused to exercise its discretion to grant a final postponement" of the loan payment. App. Br. (dkt. 6) at 18-19. This Court agrees with the Bankruptcy Court that these actions did not constitute breaches of the covenant of good faith and fair dealing; the contract expressly permitted the Bank to take both actions.

First, as discussed supra Part IV(A)(3)(ii), the CLA expressly permitted the Bank to discontinue disbursements after (a) "an event has occurred that . . . with the passage of time could become . . . an Event of Default," and (b) the Lender in its reasonable judgment determines that (i) a default has occurred and (ii) the default is not susceptible of cure. CLA (R. 31, Ex. B) Ex. F § 7(ix) at B70. Reading the CLA as implying a duty on the part of the

12

Bank to continue funding after Scott General recorded a mechanic's lien on the property would vary that express term of the contract.

Second, the CLA and promissory note both expressly permitted the Bank to refuse to grant a postponement of Mr. Shahani's loan payment under the circumstances. Under the CLA, "[u]pon the occurrence of any Event of Default" the bank had a contractual right to "[d]eclare the entire Indebtedness to be immediately due and payable" and institute a foreclosure proceeding. CLA (R. 31, Ex. B.) § 26.1 at B29. And although the promissory note gave the Bank discretion to grant an extension under certain circumstances, the note expressly limited the number of extensions Mr. Shahani could request to one. See P.N. (R. 31, Ex. D) at D1. The Bank had already granted Mr. Shahani one extension, (R. 31, Ex. C) at C1-C2; T.R. 61:5-61:14, and therefore, had no further duty to even consider his request for a second one. In sum, the Bank had no implied obligation either to continue funding or to grant Mr. Shahani an extension after the filing of the first mechanic's lien; such a reading of the CLA would be directly at odds with the contract language.

Mr. Shahani relies on Storek, 100 Cal. App. 4th 44 and Third Story Music, Inc. v. Waits, 41 Cal. App. 4th 798 (1975) for his proposition that the implied covenant began to limit the Bank's discretion after "the Bank ceased to provide consideration for Mr. Shahani's continued performance." See App. Reply Br. (dkt. 24) at 10. His argument on this point reflects a misreading of the cases. The Storek court explained that "courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power *except* in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, *result in an unenforceable, illusory agreement*." 100 Cal. App. 4th at 57 (quoting Third Story Music, 41 Cal. App. 4th at 808) (emphases added). This holding from Third Story Music does not provide a basis for varying the express terms of the contract in this case.

In Third Story Music, the court provided examples illustrating when a court should vary an express term of a contract. 41 Cal. App. 4th at 808. In that case, a music company promised to manufacture, sell, and market a musician's recordings, but also reserved the right

13

1  to elect to "refrain from any or all of the foregoing." Id. at 801. According to the court, if
2  this promise were the *only* consideration given by the music company, then reading the
3  provision literally would result in an illusory, unenforceable contract. Id. at 808. Under such
4  circumstances, to effectuate the parties' clear intent to create an enforceable contract, the
5  court would read the provision as implying a duty on the part of the music company to
6  exercise its election only in good faith. Id. But in the case before the court, the promise to
7  market the musician's recordings was not the only consideration given by the music
8  company; the company had also promised to pay the musician a minimum fee regardless of
9  its efforts to market his products. Id. Thus "whether or not an implied covenant [was] read
10 into the agreement, the agreement would be supported by consideration and would be
11 binding." Id. Therefore, the court followed the general rule and refused to vary the express
12 language of the provision. Id.

13     Like Third Story Music, this is not one of those rare cases where reading the contract
14 literally would result in an illusory agreement. The CLA, like many similar loan security
15 agreements, is supported by adequate consideration regardless of whether the Bank had an
16 implied duty to act in good faith when (i) denying funding after a default or (ii) deciding
17 whether to grant extensions. Other consideration furnished to Mr. Shahani by the Bank
18 included the extension of nine other loans. Therefore, the CLA is an enforceable contract,
19 supported by adequate consideration, and Storek and Third Story Music do not give this
20 Court the liberty to imply terms directly at odds with the CLA's express terms.

21     **C.**    **Wrongful Foreclosure Claim**

22     Mr. Shahani claims the Bank's foreclosure was invalid because the Bank recorded a
23 deficient Notice of Default. App. Br. (dkt. 6) at 22. Before a secured creditor may sell
24 collateral after a debtor defaults, it must satisfy certain statutory requirements, including
25 sending the debtor a Notice of Default that alerts the debtor to the nature of the default. Cal.
26 Civ. Code § 2924 (West 2011). "A purpose of the required statement in the notice of default
27 is to afford the debtor an opportunity to cure the default and obtain reinstatement of the
28 obligation within three months after [receiving] the notice . . . ." System Inv. Corp. v. Union

14

Bank, 21 Cal. App. 3d 137, 153 (1971). "The statutory requirements [for sale of collateral] must be strictly complied with, and a . . . sale based on a statutorily deficient notice of default is invalid." Miller v. Cote, 127 Cal. App. 3d 888, 894 (1982).

The Bank filed a Notice of Default on January 30, 2009, stating that (a) Mr. Shahani's property was in foreclosure because he was behind in his payments and (b) he had three months before the Bank would set a sale date. Notice of Default (R.31, Ex. S) at S1-S3. The notice specified that Mr. Shahani owed $1,643,030.87 and could obtain an itemized statement of the entire amount by requesting it in writing. Id. Mr. Shahani claims the notice was deficient for two reasons: (1) the Bank had notified him in early December that the loan was being extended through January 2009, which made the January 30 filing premature by two days, and (2) the notice failed to describe a default that actually existed on the day the Bank recorded it. See App. Br. (dkt. 6) at 22-23; Shahani Decl. (R. 31, Ex. X) at X12. The Bankruptcy Court entered judgment in favor of the Bank on Mr. Shahani's wrongful foreclosure claim, finding no deficiency in the Notice of Default. Bankr. Op. (R. 37) at 2. This Court affirms the Bankruptcy Court's judgment.

The Bank did not prematurely file the Notice of Default. Mr. Shahani's loan became due and payable on the extended October 5, 2008 maturity date, and Mr. Shahani has pointed to no evidence demonstrating that the Bank re-extended the loan *before* that maturity date arrived. Thus Mr. Shahani's failure to pay the loan when it became due was yet another Event of Default justifying the Bank in taking enforcement action. CLA (R. 31, Ex. B) § 25.1, at B28. Because the promissory note provided for only one extension, if the parties had wished to extend the loan a second time they should have negotiated a separate agreement for that purpose, which they evidently did not do. Although the Bank informed Mr. Shahani that his loan was being extended in an email dated December 10, 2008, see (R. 31, Ex. X) at X12, nothing in the record demonstrates that the parties ever negotiated a binding agreement to re-extend the loan. See Bankr. Op. (R. 37) at 2 (finding that "at the time of the [Bank's] email, the loan was already in default and there was nothing to extend" and "there were no contractual agreements or discussions about any definitive terms of . . . an extension").

15

Moreover, just twenty days after it suggested that it might extend the loan, on December 29, 2008, the Bank retracted that suggestion by formally notifying Mr. Shahani in a letter that it intended to proceed with foreclosure based on Mr. Shahani's failure to pay the loan by the October 5, 2008 maturity date. See (R. 31, Ex. R) at R1. Mr. Shahani never responded to the December 29 letter, which one would expect him to do if he believed he had an extension. Because Mr. Shahani had defaulted twice in June 2008 and a third time in early October 2008, the Bank's filing a Notice of Default on January 29, 2009 was not premature.

The Notice of Default also correctly identifies a default that existed on the day it was filed. The basis for foreclosure, according to the notice, was that Mr. Shahani "failed to pay the balance of the principal sum which became due." (R. 31, Ex. S) at S2-S3. This clearly referred to Mr. Shahani's failure to pay his loan when it became due on October 5, 2008, especially when considered in conjunction with the letter the Bank sent Mr. Shahani on December 29, 2008, which stated that the Bank would proceed with foreclosure based on Mr. Shahani's failure to pay off the loan by the October 5, 2008 maturity date. Between the Notice of Default and the December 29, 2008 letter, Mr. Shahani had ample notice of the basis for foreclosure; he also had ample opportunity to cure his default by paying the amounts due before the sale of his property eight months later on October 1, 2009. Therefore, the Notice of Default was adequate, and the foreclosure was not wrongful.

### D.     Estoppel and Waiver Claims

Mr. Shahani claims the Bank should be estopped from asserting the foreclosure sale was valid for three reasons: (1) the Bank accepted and encouraged Mr. Shahani's continued performance under the agreement without itself performing its obligation to make disbursements; (2) the Bank deceived Mr. Shahani into believing that it would make disbursements after vetting the contractor Mr. Shahani selected to replace Scott General; and (3) the Bank delayed responding to Mr. Shahani's September 30, 2009 request for postponement of the October 1, 2009 sale, thus preventing him from hiring an attorney to assist him with a proper emergency chapter 11 petition. See App. Br. (dkt. 6) at 19-21. The

Bankruptcy Court denied Mr. Shahani relief, and this Court confirms that the estoppel and waiver claims lack merit.

An estoppel claim consists of the following elements: "(1) a representation or concealment of material facts (2) made with knowledge, actual or virtual, of the facts, (3) to a party ignorant, actually and permissibly, of the truth, (4) with the intent, actual or virtual, that the latter act upon it, and (5) the party must have been induced to act upon it." San Diego Mun. Credit Union v. Smith, 176 Cal. App. 3d 919, 923 (1986). Whether the elements are satisfied in any given case is generally a question of fact. Id.

Mr. Shahani's first argument more resembles a waiver claim than an estoppel claim because he essentially claims that the Bank waived his breach when it allowed him to continue construction on the property. See App. Br. (dkt. 6) at 19-20. In California, as in many other states, if a non-breaching party accepts continued performance by a breaching party, it waives the breach. Leiter v. Eltinge, 246 Cal. App. 2d 306, 317-18 (1966). The CLA obligated Mr. Shahani to continue with construction until its completion, see CLA (R. 31, Ex. B) § 35.2.1, at B35-36, and it is true that the Bank accepted his continued performance of that duty and indeed urged him to continue with construction. Yet the Bank specifically provided in the CLA that "[n]o waiver by [the Bank of its rights, benefits, or remedies under the loan documents] shall be effective unless it is in writing and then only to the extent specifically stated." See CLA (R. 31, Ex. B) § 26.9, at B31. Neither of the parties addresses this clause in its brief, but this Court finds it to be crucial to the waiver claim. Because the Bank did not explicitly waive Mr. Shahani's defaults, the waiver claim must fail. The Bank also repeatedly informed Mr. Shahani that it would not continue making disbursements until Mr. Shahani cured his defaults, see, e.g., R. 31, Exs. N-Q; R-S, which further supports a finding that the Bank never waived its right to enforce its remedies.

Returning to Mr. Shahani's estoppel claims, the record does not support his second argument: that the Bank deceived him into believing it would make disbursements to an approved replacement contractor. The Bank and Mr. Shahani exchanged several emails about obtaining approval from the Bank of the new contractor selected by Mr. Shahani. See

17

App. Br. (dkt. 6) at 20-21. Mr. Shahani claims that during the course of those communications, the Bank never disclosed that it had no intention of approving the replacement contractor until Mr. Shahani had cured his defaults. See id. Whether the Bank would approve or disapprove of the replacement contractor, however, is unrelated to whether it would continue making loan disbursements while Mr. Shahani remained in default; as previously discussed, the Bank repeatedly warned Mr. Shahani that it would not continue disbursements until he had cured the defaults. Mr. Shahani even admits that one of the Bank's emails discussing approval of the replacement contractor "states that the Bank will not resume disbursements until the Scott General dispute is resolved." Id. The Bank therefore provided no basis for Mr. Shahani's belief that it would disburse loan funds to an approved replacement contractor. Because the Bank did not misrepresent or conceal material facts the estoppel claim fails.

Finally, Mr. Shahani's third argument - that the Bank should be estopped from asserting the foreclosure was valid because it failed to confirm to Mr. Shahani on the morning of the sale that it intended to proceed with selling the foreclosed property - does not form a proper basis for estoppel. The fourth element of estoppel is lacking: the Bank's intent that Mr. Shahani rely on a misrepresented or concealed material fact. Mr. Shahani claims he relied on the lack of confirmation from the Bank by neglecting to obtain legal assistance in filing an emergency bankruptcy petition. He has not, however, even alleged that the Bank *intended* him to rely on its lack of reply in that manner. Therefore, this Court affirms the Bankruptcy's court judgment, and finds no basis for estoppel.

## V. CONCLUSION

For the foregoing reasons, this Court AFFIRMS the Bankruptcy Court's judgment.

**IT IS SO ORDERED.**

Dated: September 20, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

18